**WINOOSKI HYDROELECTRIC COMPANY, Appellee,**

v.

**FIVE ACRES OF LAND IN EAST MONTPELIER AND BERLIN, VERMONT, Green Mountain Power Corporation, and unknown owners, Defendants,**

**Green Mountain Power Corporation, Appellant.**

**No. 1200, Docket 85–7065.**

United States Court of Appeals, Second Circuit.

Argued June 7, 1985.

Decided July 30, 1985.

Richard I. Rubin, Skinner & Rubin, Barre, Vt., for appellee.

Michael G. Furlong, Burlington, Vt. (William B. Gray, Sheehy, Brue & Gray, Burlington, Vt., of counsel), for appellant.

Before LUMBARD, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by a condemnee from a judgment on a jury verdict awarding $30,-000 as compensation for the taking of approximately five acres of land. Green Mountain Power Corporation ("Green Mountain"), a Vermont public utility, owned the land and dam on the Winooski River in the towns of East Montpelier and Berlin, Vermont, the property being referred to as Montpelier # 4. Winooski Hydroelectric Company ("Winooski Hydro") is a Vermont partnership which applied for a minor license to develop Montpelier # 4. Green Mountain then filed a competing application, but the license was awarded to Winooski Hydro by the Federal Energy Regulatory Commission on August 29, 1983. Section 21 of the Federal Power Act, 16 U.S.C. § 814 (1982), authorizes license holders to proceed in the federal courts to condemn the property necessary to construct the licensed project, and after negotiations failed, Winooski Hydro filed this condemnation proceeding in the United States District Court for the District of Vermont. An order granting partial summary judgment was issued on November 1, 1984, leaving only the matter of just compensation to be determined. In a jury trial before Judge Franklin S. Billings, Jr., an award of $30,000 was made.

Montpelier # 4 includes a seventy-five-year-old concrete dam which Green Mountain had operated as a hydroelectric facility until 1970, when the powerhouse roof collapsed. Green Mountain had not spent money on maintenance since 1953, except for a few minor repairs to protect the public safety, and indeed two engineers who had examined the dam thought it structurally unsound and unsafe. Green Mountain itself had considered breaching the dam to minimize its risk of collapse.

At trial Green Mountain presented several witnesses in an effort to establish that Montpelier # 4 was worth approximately $250,000. However, the district court excluded the testimony of one witness, a University of Vermont School of Business Administration professor, James F. Gatti, concerning his opinion of the property's value based upon an income approach to valuation. That exclusion is one of the three bases of appeal. The second basis is that the district court declined to charge the jury on severance damages to compensate for the diminution in value of Green Mountain property not taken by Winooski Hydro, viz., another dam upstream ("Montpelier # 5"). Finally, Green Mountain objects to the jury instruction that Green Mountain bore the burden of proof and persuasion as to the fair market value of the property taken. We affirm.

Preliminarily, we agree with the Fifth Circuit that in a condemnation action under 16 U.S.C. § 814 [1] the substantive law applied is federal law, *Georgia Power Co. v. 138.30 Acres of Land*, 617 F.2d 1112,

---

1. § 814. Exercise by licensee of power of eminent domain

When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

1115 (5th Cir.1980) (en banc), but the source of the federal law is the law of the state in which the property is located, *id.* at 1124. Hence, we look to Vermont law as much as possible to evaluate the district court's handling of the case.

■ As to the court's exclusion of Professor Gatti's testimony, we note in passing that "[t]he latitude allowed the trial court in passing on opinion evidence is nowhere greater than that pertaining to the market value of property being acquired in condemnation proceedings." *Farr v. State Highway Board,* 122 Vt. 156, 161, 166 A.2d 187, 190 (1960). We also note that Green Mountain made no offer of proof after Judge Billings refused to permit Professor Gatti to state his opinion; it thus failed to make the affirmative showing of prejudice required by Vermont law. *See Sharp v. Transportation Board,* 141 Vt. 480, 486, 451 A.2d 1074, 1076 (1982). While this alone would be enough to sustain the ruling, we also affirm the ruling as a matter of law.

Professor Gatti was allowed to testify concerning his qualifications, his competence to give opinion evidence on value, and his method of analysis using the so-called "income approach." Based on numbers provided by Winooski Hydro in interrogatories, Professor Gatti made assumptions about capital costs to construct the project, operating costs over its life, and net after-tax revenues that would theoretically accrue to the investor. He then capitalized these hypothetical earnings and subtracted the assumed value of Winooski Hydro's federal license to arrive at the fair market value of the land.

■ However, the district court excluded the ultimate question on Professor Gatti's direct examination, his opinion of value. Several considerations fully support this decision. On the most basic level, the future income calculations were too speculative, since Green Mountain had not operated any business at Montpelier # 4 for over a decade. Although the Vermont courts have approved the income approach in certain circumstances, *see, e.g., Town of Bar-*

*net v. New England Power Co.,* 130 Vt. 407, 412, 296 A.2d 228, 231 (1972); *Crawford v. State Highway Board,* 130 Vt. 18, 24, 285 A.2d 760, 764 (1971), they have not hesitated to disallow its use when business prospects are too uncertain to yield reliable figures, either because of the absence of an ongoing business or because of the lack of a market for goods produced, *see, e.g., Green Mountain Marble Co. v. State Highway Board,* 130 Vt. 455, 463, 296 A.2d 198, 203 (1972) (income approach inapplicable partly because the "quarry was neither used in the business nor did it contribute income to the company's operation"); *Farr v. State Highway Board,* 123 Vt. 334, 338, 189 A.2d 542, 545 (1963) (condemnee operated a sand pit with substantial sales but the court held that "[t]he uncertainties of the commodity market and the unpredictable and speculative nature of anticipated profits or unexpected losses, forbid the evaluation of the sand deposits as potential merchandise"). That Professor Gatti's figures were based on Winooski Hydro's guesswork does not make them any less guesswork.

Judge Billings also rejected the use of the income approach because it measured the property's value to the condemnor rather than to the condemnee. "It is a well settled rule that . . . it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken." *United States ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 1055, 87 L.Ed. 1390 (1943). *See also, e.g., Monongahela Navigation Co. v. United States,* 148 U.S. 312, 343, 13 S.Ct. 622, 633, 37 L.Ed. 463 (1893). Appellant argues, however, that in Vermont just compensation is determined by the property's fair market value when put to its highest and best use—a value independent of both condemnor and condemnee—and that in this case the parties agreed that the highest and best use of Montpelier # 4 was for hydroelectric production.

■ Vermont statutory law defines just compensation as "the value for the most reasonable use of the property," Vt.Stat.

Ann. tit. XIX, § 221(2) (1973); *see also id.* tit. XII, § 1905 (1968), and the cases have uniformly held that the "most reasonable" use need not be the current use, *see, e.g., Sharp,* 141 Vt. at 488, 451 A.2d at 1077; *Childrens' Home, Inc. v. State Highway Board,* 125 Vt. 93, 100, 211 A.2d 257, 263 (1965). A condemned property's potential use can enhance its present market value, and that enhanced value is properly considered in making a condemnation award. *Id.* at 96, 211 A.2d at 260.

 But the Vermont courts have carefully distinguished between this enhanced market value and lost profits from a frustrated business opportunity, which are not compensable. *Id.* ("Perhaps the highway project frustrated the plaintiff's plans for future development of the frontage. If so, that was not the appropriation of a compensable interest in the land taken ...."). Consequently, the Vermont Supreme Court has realized the danger of using the potential income from a potential business as an indication of the property's fair market value. *See, e.g., Farr,* 123 Vt. at 339–40, 189 A.2d at 545–46 (award upheld because special verdict demonstrated that jury was not affected by evidence of potential income from sand deposits, but merely took deposits into account as one factor affecting market value).

Federal eminent domain cases have also recognized this danger. Most illuminating is *Public District No. 1 v. City of Seattle,* 382 F.2d 666 (9th Cir.1967), *cert. denied,* 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59 (1969) ("PUD"), a case almost directly on point, concerning the value of property condemned under 16 U.S.C. § 814. The court there acknowledged that the property's value as a power site can increase its market value by the "increment which one engaged in the assembling of lands needed for a power project would be willing to pay in order to be able to include such land in its needed package." *Id.* at 673. But the court also identified "the highly enhanced value that may attach to the fully assembled land package ... due to the fact that the prospective power project is dependent

upon use of that package," and warned that proof of that enhanced value by capitalizing the anticipated income from the project "comes perilously close to being impermissible proof of profit attributable to a frustrated business opportunity rather than to land itself." *Id.* (citing *United States v. Grand River Dam Authority,* 363 U.S. 229, 236, 80 S.Ct. 1134, 1138, 4 L.Ed.2d 1186 (1960)).

Moreover, the income approach is especially inappropriate here, where the condemnee was refused the license necessary to build the proposed facility. As the *PUD* court put it, "Common sense tells us in such a case that the multimillion dollar loss claimed by the condemnee is not due to the taking of a few acres of land but to its failure to qualify for the needed license." 382 F.2d at 674.

 The trial court was also quite correct in keeping the issue of severance damages from the consideration of the jury. While severance damages are awardable under the law of Vermont, *Whitcomb v. State Highway Board,* 133 Vt. 500, 501, 346 A.2d 187, 188 (1975); *Childrens' Home,* 125 Vt. at 95, 211 A.2d at 260, the burden is on the landowner to prove that the condemned property and the remaining property are necessary and mutually dependent elements of one enterprise, *Sharp v. United States,* 191 U.S. 341, 354–56, 24 S.Ct. 114, 117–18 (1903); *Essex Storage Electric Co. v. Victory Lumber Co.,* 93 Vt. 437, 447, 108 A. 426, 429 (1919). Green Mountain did not meet that burden. The only evidence proffered was that of a Green Mountain corporate official, who testified that the company had considered developing Montpelier # 5 to store water for release to Montpelier # 4 at times of peak demand, and that alone Montpelier # 5 would have no economic utility to his company, though he conceded that "it might have value to someone else." This testimony did nothing but describe a lost business opportunity. At best, as the official admitted, the utilization of the upstream dam was "merely a concept without full justification." But no law exists to support a

claim for lost profits on severed lands absent clear and demonstrable proof that an ongoing business was adversely affected. *Sharp*, 141 Vt. at 486, 451 A.2d at 1076; *see also PUD*, 382 F.2d at 674 & n. 11.

Probably the appellant's strongest point relates to the court's charge on burden of proof. The court specifically said,

If the evidence on any issue in the case is evenly balanced, then the party having the burden has not sustained his burden of proof on that issue or question, and you should find for the opposing party on that issue or question.

In a condemnation case such as this, the burden of proof is on the land owner, in this case the Green Mountain Power Corporation, to establish the fair market value of the property at the time of the taking.

▮ Since fair market value is found by weighing of all of the evidence, however, *Petition of Mallary*, 127 Vt. 412, 418–19, 250 A.2d 837, 841 (1969), no party has the burden of proof on the issue of the amount of compensation. As the Commissioners on Uniform State Laws state in their Comment to Unif. Eminent Domain Code § 904, 13 U.L.A. 93–94 (1980), "[i]t seems difficult to assign an intelligible meaning to the concept of 'burden of proof' in the eminent domain context, since the pleadings are not required to allege or deny the amount of compensation claimed, and the ultimate standard of decision is the constitutional rule of 'just compensation.'" Necessarily, as they go on to say, "the ultimate determination necessarily reflects the weight and degree of credibility accorded to [conflicting] estimates." *See also Martin v. City of Columbus*, 101 Ohio St. 1, 127 N.E. 411 (1920). But in this case, counsel at a pretrial conference agreed that Green Mountain had the burden of proof and therefore was entitled to open and close the evidence. Moreover, the charge did instruct the jury to weigh the opinions of the various witnesses and all of the evidence in the case. As the court said, "it is your job to weigh the different methods of evaluation in arriving at the fair market value of this property" and "[y]our duty is to weigh all the evidence and arrive at a fair and just compensation." This part of the instruction was in accordance with the law of Vermont. The judgment will not be reversed on this ground.

Judgment affirmed.